# 16-1912-cv

## United States Court of Appeals

*for the*

## Second Circuit

―――――――●――――――――

JOSEPH WAGGONER, MOHIT SAHNI, BARBARA STROUGO,
individually and on behalf of all others similarly situated,

*Plaintiffs-Appellees,*

― v. ―

BARCLAYS PLC, ROBERT DIAMOND, ANTONY JENKINS,
BARCLAYS CAPITAL INC., WILLIAM WHITE,

*Defendants-Appellants,*

CHRIS LUCAS, TUSHAR MORZARIA, BOB DIAMOND,

*Defendants.*

―――――――――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF *AMICI CURIAE* SECURITIES LAW PROFESSORS
## IN SUPPORT OF PLAINTIFFS-APPELLEES

ROBERT B. THOMPSON
600 New Jersey Avenue N.W.
Washington, D.C. 20001
(202) 661-6591

ROBERT V. PRONGAY
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150

*Counsel for Amici Curiae Securities Law Professors*

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* Securities Law Professors are not a nongovernmental corporate party.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .........................................................i

TABLE OF AUTHORITIES ...................................................................iv

INTEREST OF AMICI CURIAE....................................................................1

I.    SUMMARY OF ARGUMENT....................................................................2

II.   GIVEN CHANGES IN MODERN MARKETS, THE SUPREME COURT'S DECISIONS IN *BASIC* AND *HALLIBURTON II* REFLECT A RELATIVE NARROWING OF THE ROLE FOR RELIANCE IN RULE 10b-5 SECURITIES LITIGATION..........................5

    A.   In *Basic*, the Court Recognized That Markets Had Replaced Direct Interactions between Buyers and Sellers in Securities Transactions............................................................5

    B.   The Standard for Rebutting the Presumption of Investor Reliance on Misrepresentations Is a Demanding One .........................8

        1.   The Justices in *Basic* and *Halliburton II* Understood That the Rebuttal Standard Is High ....................................8

        2.   Congress Left the Demanding Rebuttal Standard Untouched in Legislation Addressing Possible Abuses in Securities Litigation after *Basic*...............................10

        3.   The Supreme Court's Decisions in *Amgen* and *Halliburton I* Make Little Sense if Defendants Can Easily Rebut Fraud on the Market at the Class Certification Stage .......................................................11

        4.   *Amgen* Reflected a Narrowing Interpretation of Plaintiffs' Overall Burden of Proof at the Class Certification Stage....................................................13

5.  By Contrast, in Order to Rebut a Fraud-on-the-Market Presumption, Defendants Bear a High Burden of Proof...........14

III.  A HIGH REBUTTAL STANDARD AT THE CLASS CERTIFICATION STAGE REFLECTS THE EVIDENTIARY CHALLENGE OF SHOWING THAT THE LACK OF PRICE IMPACT WAS DUE TO A LACK OF FRAUD .........................................16

A.  The Supreme Court Has Authorized the Use of Event Studies to Meet Defendants' Rebuttal Burden......................................................16

B.  An Absence of Price Impact Does Not Necessarily Indicate the Absence of Fraud..................................................................................22

1.  Price Change and Price Distortion Do Not Go Hand-in-Hand ........................................................................................22

2.  Defendant Must Tease Out Other Reasons for a Price Change When Rebutting the Presumption................................23

IV.  CONCLUSION.............................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds,*
133 S. Ct. 1184 (2013) ................................................................. *passim*

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988) ..................................................................... *passim*

*Erica P. John Fund, Inc. v. Halliburton Co.,*
309 F.R.D. 251 (N.D. Tex. 2015) ...............................................21, 25

*Erica P. John Fund, Inc. v. Halliburton Co.,*
563 U.S. 804 (2011) ..................................................................... *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.,*
134 S. Ct. 2398 (2014) ................................................................. *passim*

*In re Moody's Corp. Sec. Litig.,*
274 F.R.D. 480 (S.D.N.Y. 2011) .......................................................14

*In re Salomon Analyst Metromedia Litig.,*
544 F.3d 474 (2d Cir. 2008),
*abrogated by Amgen*, 133 S. Ct. 1184 (2013) ....................................26

**Federal Statutes**

15 U.S.C. § 78a . .................................................................................6

15 U.S.C. § 78u-4...............................................................................10

Private Securities Litigation Reform Act of 1995, Pub. L. 104-67,
109 Stat. 737 ..............................................................................*passim*

**Rules**

Fed. R. Civ. P. 23 ..........................................................................*passim*

iv

# Other Authorities

Alon Brav & J.B. Heaton,
  *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*,
  93 WASH. U. L. REV. 583 (2015) ........................................................21

Donald C. Langevoort, *Basic at Twenty: Rethinking Fraud on the Market*, 2009 WIS. L. REV. 151 (2009) ........................................................11, 23

Donald C. Langevoort, *Judgment Day for Fraud-on-the-Market: Reflections on Amgen and the Second Coming of Halliburton*, 57 ARIZ. L. REV. 37 (2015) ........................................................12

Hillary A. Sale & Robert B. Thompson, *Market Intermediation, Publicness, and Securities Class Actions*, 93 WASH. U. L. REV. 487 (2015) ........................................................23

Jill E. Fisch, T*he Future of Price Distortion in Federal Securities Fraud Litigation*, 10 DUKE J. CONST. L. 87 (2015) ........................................................22

Jill E. Fisch, Jonah B. Gelbach, and Jonathan Klick,
  *After Halliburton: Event Studies and Their Role in Federal Securities Fraud Litigation*,
  Univ. of Pa. Law Sch., Inst. for Law & Econ. Research Paper No. 16-16 (Aug. 1, 2016) ........................................................21

Jill E. Fisch, *The Trouble with Basic: Price Distortion After Halliburton*,
  90 WASH. U. L. REV. 895 (2013). ........................................................23

Jonah B. Gelbach, Eric Helland & Jonathan Klick,
  *Valid Inference in Single Firm, Single Event Studies*,
  15 AM. L. & ECON. REV. 495 (2013) ........................................................21

Letter from Harry Blackmun to William Brennan (Jan. 15, 1988)
  (on file with counsel) ........................................................9

Letter from William Brennan to Harry Blackmun (Jan. 27, 1988)
  (on file with counsel) ........................................................9

Mark L. Mitchell & Jeffry M. Netter,
  *The Role of Financial Economics in Securities Fraud Cases:*
  *Applications at the Securities and Exchange Commission,*
  49 Bus. Law 545 (1994)......................................................................19

*Merritt B. Fox, Halliburton II: It All Depends on What Defendants*
  *Need to Show to Establish No Impact on Price,*
  70 Bus. Law 437 (2015)......................................................................17

## INTEREST OF AMICI CURIAE

*Amici* are academics with particularized expertise in securities law.[1] This *amici curiae* brief reflects their collective view that, at the class certification stage of a Rule 10b-5 action, a defendant should bear a relatively high burden of proof in order to rebut the fraud-on-the-market presumption of reliance that the Supreme Court first recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). More specifically, *amici curiae* urge this Court to affirm the decision of the lower court which—consistent with other courts in this Circuit—held that a defendant seeking to rebut the presumption at the class certification stage must show by a preponderance of the evidence that a misrepresentation did not in fact affect the company's stock price.

In alphabetical order, *amici curiae* are:

James D. Cox, Brainerd Currie Professor of Law, Duke University;

Jill E. Fisch, Perry Golkin Professor of Law, University of Pennsylvania Law School;

Merritt B. Fox, Michael E. Patterson Professor of Law and the NASDAQ Professor for the Law and Economics of Capital Markets, Columbia Law School;

---

[1] No counsel for a party authored this brief in whole or in part, and no one other than amici curiae or their counsel contributed money to fund the preparation or submission of this brief. Counsel for all defendants have consented to the filing of this amici brief.

1

Thomas Lee Hazen, Cary C. Boshamer Distinguished Professor, School of Law, The University of North Carolina at Chapel Hill;

Donald Langevoort, Thomas Aquinas Reynolds Professor of Law, Georgetown University Law Center;

James Park, Professor of Law, UCLA School of Law;

Frank Partnoy, George E. Barrett Professor of Law and Finance, University of San Diego School of Law;

Hillary A. Sale, Walter D. Coles Professor of Law and Professor of Management, Washington University School of Law;

Randall S. Thomas John S. Beasley II Professor of Law and Business, Vanderbilt Law School;

Robert B. Thompson, Peter P. Weidenbruch Jr. Professor of Business Law, Georgetown University Law Center;

Urska Velikonja, Associate Professor of Law, Emory University School of Law.

## I.  SUMMARY OF ARGUMENT

The Supreme Court's decision in *Basic*—reaffirmed almost a quarter century later in *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ("*Halliburton II*")—erected a presumption that, in an efficient market, investors will rely on misinformation disseminated by a company.  With this brief, *amici*

seek to provide the Court with a broader historical and evidentiary backdrop against which to consider the crux of the parties' dispute on appeal: whether the proposed class in this Rule 10b-5 case meets the predominance requirement of Fed. R. Civ. P. 23(b)(3), where the presumption of reliance is based on *Basic*'s "fraud-on-the-market theory" rather than on individualized proof.

The Supreme Court explicitly grounded its decisions in *Basic* and *Halliburton II* on fundamental changes in securities markets that occurred after the first enactment of the federal securities laws in the early 1930s, i.e., a shift from direct buyer/seller interactions to a recognition that the *market itself* functions as the essential intermediary between issuers and investors. The Court in *Basic* accordingly proceeded from the assumption that "our understanding of Rule 10b-5 reliance must encompass these differences." 485 U.S. at 244. As a result, the role of reliance in Rule 10b-5 securities cases has become relatively narrow; the realities of modern securities markets make individualized reliance very difficult to prove. Like the Supreme Court, Congress recognized this shift by refusing to tinker with *Basic* despite making changes to other elements of Rule 10b-5 litigation in the Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 ("PSLRA").

Importantly, the *Basic* decision left room for defendants to rebut the presumption of reliance at class certification under certain circumstances. But the

rebuttal aspect of the *Basic* presumption has long been understood by the Court as placing a necessarily high burden on a defendant to prove that the alleged misrepresentation did not actually affect the stock's market price. This burden should apply with equal force at the class certification stage. In this Circuit, lower courts have thus required that defendants show the absence of price impact by a preponderance of evidence. *Amici* contend that this Court should endorse this approach, as it best reflects the realities of the modern securities markets and the rationale behind the decisions in *Basic* and its progeny. It also pays heed to Congress's choice to leave the reliance/rebuttal test undisturbed.

*Amici* also invite this Court to provide guidance for lower courts tasked with construing so-called "event studies," which the *Halliburton II* Court permitted for purposes of demonstrating both the presumption and rebuttal at the class certification stage. Event studies should be utilized with an eye towards implementing these same policy choices. Accordingly, defendants using event studies to negate the reliance presumption should be held to rigorous standards of proof. Although the absence of a price change in a particular circumstance is a necessary condition for severing the connection between misinformation and investor reliance, it is often insufficient. The reasons for a price change are myriad, and thus cannot be easily isolated as unrelated to fraud. Moreover, in some cases there may be no price change at the time of the alleged misleading

statement—the usual context at which stock price alterations are judged in Rule 10b-5 cases—whereas there is visible price distortion at the time the company makes corrective statements. Under such circumstances, the defendant must meet its evidentiary burden of convincing the court that the *absence* of price impact is best explained by a "no fraud" narrative.

## II. GIVEN CHANGES IN MODERN MARKETS, THE SUPREME COURT'S DECISIONS IN *BASIC* AND *HALLIBURTON II* REFLECT A RELATIVE NARROWING OF THE ROLE FOR RELIANCE IN RULE 10b-5 SECURITIES LITIGATION

### A. In *Basic*, the Court Recognized That Markets Had Replaced Direct Interactions between Buyers and Sellers in Securities Transactions

*Basic* established a rebuttable presumption of reliance that derives in part from a so-called "fraud-on-the-market theory." The Court explained: "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." 485 U.S. at 241 (citation omitted). On this theory, a defendant's "[m]isleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Id.* at 241-42. In other words, post-*Basic*, direct reliance on misrepresentation is not required in order for plaintiffs to demonstrate reliance on misinformation in a Rule 10b-5 action.

The *Basic* Court's decision to create a rebuttable presumption of reliance

supported in part by the fraud-on-the-market theory reflected changes in the

economic realities of modern securities markets that had occurred since the

passage of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* As the

Court explained, "[m]odern securities markets, literally involving millions of

shares changing hands daily, differ from the face-to-face transactions contemplated

by early fraud cases, and our understanding of Rule 10b-5's reliance requirement

must encompass these differences." *Basic,* 485 U.S. at 243-44. By the time the

Court issued its decision in *Basic*, the *market itself* had become an essential actor

in securities transactions and an accepted intermediary between issuers and

investors, both in enforcement and disclosure. Thus, the direct contact between

buyer and seller anticipated in the structure of the original securities laws was no

longer the norm, having given way to a mostly indirect relationship intermediated

through markets. As a result, required disclosure had moved far from its original,

direct-contact channel, and fraud enforcement came to focus more on the collective

relationships within the market and less on the individual. Quoting a lower court

decision by Judge Patrick Higginbotham, the Supreme Court thus likened the

market to "the unpaid agent of the investor, informing him that given all the

information available to it, the value of the stock is worth the market price.'" *Id.* at

244 (quoting *In re LTV Sec. Litig.*, 88 F.R.D. 134, 143 (N.D. Tex. 1980)).

With this historical context, the Court in *Basic* recognized that the traditional way of proving reliance—i.e., an individual plaintiff shows awareness of a company's statement and purchases stock based on it—"would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." *Id.* at 245. Indeed, such traditional individualized proof of reliance "effectively would . . . prevent[] [plaintiffs] from proceeding with a class action, since individual issues then would have overwhelmed the common ones." *Id.* at 242 (citing Fed. R. Civ. P. 23(a)(2) and (b)(3), which requires that common questions predominate). In turn, such a result would severely hinder private enforcement of Rule 10b-5, which the *Basic* Court deemed "an essential tool for enforcement of the 1934 Act's requirements." *Id.* at 231.

In a trilogy of cases since 2011—including *Halliburton II*, *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds,* 133 S. Ct. 1184 (2013), and *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804 (2011) ("*Halliburton I*")—the Court reiterated that the role of reliance in Rule 10b-5 cases had shifted, such that "an unnecessarily unrealistic evidentiary burden" on plaintiffs at the certification phase would have a preclusive effect on class actions. *See Halliburton II*, 134 S. Ct. at 2407-09; *Amgen*, 133 S. Ct. at 1192-93; *Halliburton I*, 563 U.S. at 810-11.

## B. The Standard for Rebutting the Presumption of Investor Reliance on Misrepresentations Is a Demanding One

In *Basic* and subsequent cases, the Court has consistently treated the standard for rebutting the presumption of reliance as a demanding one. As explained below, independent writings by the Justices affirm that view. Congress also reinforced this understanding by leaving the rebuttal standard intact after *Basic*—despite making legislative changes to other elements of a 10b-5 claim. As the Supreme Court's recent decisions indicate, therefore, Rule 10b-5 litigation has increasingly focused on the other elements of fraud. The Court has also taken pains to narrow the plaintiffs' burden at the class certification stage in Rule 10b-5 litigation. Accordingly, *Amici* endorses the relatively high burden of proof required on rebuttal by most lower courts in this Circuit because it properly reflects these myriad understandings.

### 1. The Justices in *Basic* and *Halliburton II* Understood That the Rebuttal Standard Is High

The Court papers of Justices Blackmun and Brennan (two of the four-person majority in *Basic*) include an exchange of letters regarding the rebuttal language. The letters indicate the Justices' assessment that, in general, defendants would find it very burdensome or impractical to meet the rebuttal burden envisioned in *Basic*. Indeed, the Justices agreed that there was little practical difference between their views of the burden imposed on a defendant seeking to rebut the presumption of

reliance because it was, in Justice Blackmun's words, "very burdensome to prove" and, in Justice Brennan's words, "impractical to utilize."  Letter from Harry Blackmun to William Brennan at 2 (Jan. 15, 1988), *available at* https://lccn.loc.gov/mm99084430 Box 70, Harry A. Blackmun Papers, Manuscript Division, Library of Congress, Washington, D.C. (on file with counsel); Letter from William Brennan to Harry Blackmun (Jan. 27, 1988), *available at* https://lccn.loc.gov/mm82052266 Box II: 107, William J. Brennan Papers, Manuscripts Division, Library of Congress, Washington, D.C.  (on file with counsel).  Justice White, dissenting from the majority's creation of the presumption, went so far as to describe the rebuttal standard as "virtually impossible in all but the most extraordinary cases."  *Basic*, 485 U.S. at 256 n.7 (White, J., dissenting).

A similar view regarding the heavy burden placed on a defendant seeking to rebut the *Basic* presumption was shared by the six Justices who joined the two concurring opinions in *Halliburton II*.  Justice Ginsberg, joined by Justices Breyer and Sotomayor, noted that the rebuttal requirement in *Halliburton II* "should impose no heavy toll *on securities-fraud plaintiffs* with tenable claims."  134 S. Ct. at 2417 (emphasis added).  Justice Thomas, concurring in the judgment and joined by Justices Scalia and Alito, likewise observed that *Basic*'s presumption—which

they would have liked to have seen overturned—"is virtually irrebuttable in practice." *Id.* at 2420.

>    **2.    Congress Left the Demanding Rebuttal Standard Untouched in Legislation Addressing Possible Abuses in Securities Litigation after *Basic***

Seven years after *Basic*, and in the wake of the shift to securities transactions occurring through intermediated markets as well as the increasing use of class actions to effect private enforcement of Rule 10b-5, Congress passed legislation addressing possible abuses in securities class action litigation. Among other changes, it strengthened what is required to prove a Rule 10b-5 claim.[2] In particular, in the Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737, Congress modified the showing required for four of the traditional elements of common law fraud, which the law governing securities fraud has incorporated.[3] Notably, however, the reliance element of the *Basic* presumption and rebuttal structure was left unchanged.

---

[2] To recover damages for violations of section 10(b) and Rule 10b–5, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton II*, 134 S. Ct. at 2407 (quotation omitted).

[3] The Act specifies that plaintiffs must prove loss causation; gives defendants an early opportunity, prior to any discovery in the suit, to have a motion to dismiss heard as to the sufficiency of pleadings on the questions of scienter and misleading statements; and provides a broad safe harbor for forward-looking statements that would not be considered material. *See* 15 U.S.C. § 78u-4.

Congress's failure to act on the reliance standard established by *Basic* was not an oversight. In *Amgen*, the Court counted as "significant" the multiple Congressional steps to curb abusive securities-fraud lawsuits while rejecting calls to undo the fraud-on-the-market presumption of class wide reliance endorsed in *Basic*. 133 S. Ct. at 1201 (citing Donald C. Langevoort, *Basic at Twenty: Rethinking Fraud on the Market*, 2009 WIS. L. REV. 151, 153 & n.8 (noting that the initial version of H. R. 10, 104th Cong., 1st Sess. (1995)—an unenacted bill that, like the PSLRA, was designed to curtail abuses in private securities litigation—"would have undone *Basic*")); Common Sense Legal Reform Act: Hearings before the Subcommittee on Telecommunications and Finance of the House Committee on Commerce, 104th Cong., 1st Sess., 92, 236-37, 251-52, 272 (1995) (witness testimony criticizing the fraud-on-the-market presumption and expressing support for H. R. 10's requirement that securities-fraud plaintiffs prove direct reliance)).

3. **The Supreme Court's Decisions in *Amgen* and *Halliburton I* Make Little Sense if Defendants Can Easily Rebut Fraud on the Market at the Class Certification Stage**

Moreover, the Supreme Court's decisions regarding the other elements of Rule 10b-5 fraud cannot be reconciled with a relatively light burden for rebutting the presumption of reliance. Just prior to *Halliburton II*, the Court in *Halliburton I* and *Amgen* rejected the argument that a plaintiff at the class certification stage

must prove loss causation and materiality in connection with the purchase or sale of a security. Then in *Halliburton II*, it explicitly eschewed a "radical" alteration to the reliance requirement.[4] 134 S. Ct. at 2415. Notably, in passing the PSLRA in 1995, Congress similarly provided an opportunity for defendants to move to dismiss a Rule 10b-5 complaint, before discovery, based on a lack of scienter or misleading statements—without providing a similar opportunity to dismiss a complaint on the elements of loss causation, materiality, or reliance. If this Court were to nonetheless hold that defendants bear a light burden in rebutting the fraud-on-the-market presumption, the Supreme Court case law in this area would no longer make sense.

---

[4] The elements of materiality, reliance and loss causation have specific roles in fraud determination. Materiality demonstrates that the alleged misleading statement was sufficiently important to be actionable; reliance ensures that, even if the statement was misleading, material and done with the appropriate mental state, it is sufficiently linked to an action plaintiff took; and loss causation ensures that, even if the statement were misleading, material, done with the appropriate mental state and sufficiently linked to the action that plaintiff took, recovery should only be for the loss can be attributed to the fraud. In a real transaction, the lines between these elements can blur, so the same evidence as to lack of price impact is often used to show lack of materiality and lack of loss causation without sufficiently distinguishing between them. Donald C. Langevoort, *Judgment Day for Fraud-on-the-Market: Reflections on Amgen and the Second Coming of Halliburton*, 57 ARIZ. L. REV. 37, 46 (2015) (describing Rule 10b-5 litigation as a "game of whack-a-mole").

### 4. *Amgen* Reflected a Narrowing Interpretation of Plaintiffs' Overall Burden of Proof at the Class Certification Stage

Additionally, in *Amgen* the Court emphasized that the class action inquiry is narrow. 133 S. Ct. at 1194-95. The purpose of the inquiry at class certification is not to adjudicate the merits of the claim, but to ensure that the requisites of Fed. R. Civ. P. 23(b)(3) are met, with the primary focus on whether questions common to the class predominate. The Court thus made a point of distinguishing between "whether materiality is an essential predicate" of a Rule 10b-5 claim, which is not "the key question" at the class certification stage, and "the pivotal inquiry [of] whether proof of materiality is needed to ensure that the *questions* of law or fact common to the class will 'predominate . . . .'" *Id.* at 1195 (citing Fed. R. Civ. P. 23(b)(3)) (emphasis in original).

In holding that proof of materiality is *not* a prerequisite to class certification, the Court referred to the legislative determinations reflected in the PSLRA, observing that it had "no warrant to encumber securities-fraud litigation by adopting an atextual requirement of precertification proof of materiality that Congress, despite its extensive involvement in the securities field, has not sanctioned." *Id.* at 1202. The Court also warned that the increasing focus on procedural issues at class certification would result in "a mini-trial . . . at the class-certification stage . . . [that] would entail considerable expenditures of judicial time and resources, costs scarcely anticipated by Federal Rule of Civil Procedure

23(c)(1)(A), which instructs that the decision whether to certify a class action be made '[a]t an early practicable time.'" *Id.* at 1201. With respect to the element of reliance, as well, this Court should reject the invitation to legislate a higher burden of proof at the class certification stage by enabling defendants to rebut the existing presumption with anything short of demanding evidence.

### 5. By Contrast, in Order to Rebut a Fraud-on-the-Market Presumption, Defendants Bear a High Burden of Proof

Whereas the presumption of reliance does not require individualized proof under *Basic* and its progeny, the rebuttal element has always been understood to place a true burden on a defendant to prove that the presumption is inapplicable. The approach adopted by lower courts in this Circuit—under which defendants must show the absence of impact on price by a preponderance of evidence in order to rebut the presumption—properly reflects the longstanding interpretation of the rebuttal standard as a stringent one. *See, e.g., In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 490 (S.D.N.Y. 2011).

Both *Basic* and *Halliburton II* recognize that the presumption of reliance and the rebuttal standard are grounded in common sense, feasibility, and fealty to the congressional objective of making the securities laws meaningfully protective of investors. The Court in *Basic* characterized the rebuttal as arising from "[a]ny showing that *severs the link* between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market

14

price." 485 U.S. at 248 (emphasis added). Although "any" invites the possibility of multiple methods for making the required "showing," the Court made clear that the evidence must be sufficient to "sever[] the link" between the alleged misrepresentation and the presumed fact of reliance. Because the link cannot be severed without evidence that breaks the chain of inferences giving rise to the presumption, that break requires that a defendant actually prove severance. Moreover, not all evidence will sever the link; the evidence must be persuasive and, as most lower courts have found, this requires a preponderance of the evidence. For example, the Court in *Basic* suggested that a defendant could rebut the fraud-on-the-market presumption by showing that the "market makers" were privy to the truth and "thus that the market price would not have been affected by their misrepresentations." *Id.*

Reaffirming the presumption/rebuttal structure, the Court in *Halliburton II* elaborated on what a sufficient evidentiary showing of "absence of price impact" requires, i.e., "defendant's direct . . . evidence showing that the alleged misrepresentation did not actually affect the stock's market price." 134 S. Ct. at 2415-16. The Court also stated that the defendant's evidence must be "more salient" than the evidence presented by the plaintiffs to trigger the presumption, and refused any "radical" alteration on the required showing of reliance under Rule 10b-5. *Id* at 2414-16. Rather, the *defendant* bears the much greater burden of

showing that the particular misrepresentation did not actually "affect the stock market's price." *Id*. at 2414, 2416, 2417. Consistent with the spirit of *Halliburton II*, this Court should likewise hold that, in order to meet this burden at the class certification stage, the defendant must offer evidence that is sufficient, in effect, to prove a negative—that no price effect occurred—by a preponderance of the evidence.

## III. A HIGH REBUTTAL STANDARD AT THE CLASS CERTIFICATION STAGE REFLECTS THE EVIDENTIARY CHALLENGE OF SHOWING THAT THE LACK OF PRICE IMPACT WAS DUE TO A LACK OF FRAUD

While lower courts since *Halliburton II* have begun to address rebuttal in specific fact contexts, few cases have discussed how defendants can attempt to meet the specific standard of showing that the lack of price impact was due to a lack of fraud, a subject that *amici* address below.

### A. The Supreme Court Has Authorized the Use of Event Studies to Meet Defendants' Rebuttal Burden

Event studies were a key topic in the oral arguments and the Court's opinion in *Halliburton II*. 134 S. Ct. at 2415-16. Event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Id.* at 2415. While plaintiffs are not required to offer event studies, they are permitted to do so to help satisfy the conditions necessary to trigger the presumption of reliance for class certification purposes.

*See id.* Likewise, the Court in *Halliburton II* determined that defendants could also use event studies to rebut the presumption at the class certification point of the litigation. *Id.* at 2415.[5]

Left unspecified, however, was the standard by which to judge the sufficiency of such evidence. One approach suggested by Professor Merritt Fox is for "the courts to impose the same statistical burden on defendants seeking to show there was no price effect as is currently imposed on plaintiffs, *at the loss causation stage of the litigation*, to show that there was a price effect."[6] *Halliburton II* made the absence of price impact the central question of the rebuttal question in a Rule 10b-5 case alleging fraud that caused harm to a class of plaintiffs. One obvious way to determine whether an alleged fraud distorts price would be to observe price changes on the market at the time of the false disclosure. However, when the misstatement does not lead to a price change but still distorts price (for example, by maintaining the price at a higher level than if the truth had been told), a price

---

[5] Event studies may be necessary for defendants to thread the needle of providing more salient evidence about price impact without crossing over to the materiality and loss causation issues that *Amgen* and *Halliburton I* precluded from consideration at the class certification stage.

[6] *Merritt B. Fox, Halliburton II: It All Depends on What Defendants Need to Show to Establish No Impact on Price*, 70 Bus. Law 437 (2015). (emphasis added). Professor Fox also suggests, and then compares, a second approach to permit defendant's rebuttal by persuading the court that the plaintiff will not be able to meet the plaintiff's statistical burden concerning price effect when it is later called upon to demonstrate loss causation at the time of summary judgment or trial. *Id.* at 438.

change that occurs at a later time—when the truth comes out (the "corrective disclosure")—can be used as the best available measure. Yet at either time, the observed change includes both the impact of the alleged fraud and of other information about the company affecting how an investor would value the firm.

An event study is a tool of financial economics that attempts to assess the likelihood that the corrective disclosure relating to the alleged fraud had a price impact. The event study first looks at the change in price at the event day (*e.g.*, the corrective disclosure) as compared to the previous day, and adjusts for changes that impact the entire market and industry on that day. What is left is only the change that was specific to this particular company for that day. However, it is still over-inclusive as it includes both changes from the fraud and changes from non-fraud events affecting that particular company on that day. To make a further adjustment, the evaluator looks at the company's average change over a period of time and uses statistical methods to test a hypothesis that the observed change was because of ordinary non-fraud related changes that would be expected during the year. If the change on the event day is 95% or 90% higher than what would be expected on a stated number of days, the evaluator would say that the "null

hypothesis"—that the change is from ordinary non-fraud reasons—can be rejected.[7]

For a plaintiff seeking to show price change at a trial on the merits, an event study would enable the expert to reject, with at least 90% confidence, the null hypothesis that the observed market-adjusted price change was due entirely to factors *other than* the disclosure correcting the misstatement.  On the other hand, for defendants seeking to rebut the presumption of reliance, the comparable null hypothesis would be that the market-adjusted price change for the day of the corrective disclosure *did result from* the disclosure correcting the misstatement; if a *positive* price change on the event day is greater than the changes on 95% or 90% of the other trading days, the expert can reject the null hypothesis.[8]  This structure imposes symmetrical statistical burdens.  Professor Fox explains:

> The plaintiff needs to show a negative effect on price from the corrective disclosure to establish loss causation at the merits stage of the litigation.  Under *Halliburton II*, the defendant needs to show no effect on price to defeat the presumption at the class certification stage.  Each showing involves the problem that the price effect of

---

[7] Ninety-five percent is an often-used confidence level.  Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission,* 49 BUS. LAW 545, 564 (1994) (describing 10% as a commonly used decision rule along with 1% and 5%).

[8] Professor Fox reports the standard learning from statistics—that being able to reject the null hypothesis with 95% confidence so that an expert would feel comfortable that the change reflects the corrective disclosure—does not necessarily support the opposite inference that an inability to reject the null hypothesis suggests no negative price effect from the fraud.  Fox*, supra* note 5, at 455.

the corrective disclosure is not directly observable because of the other news that affects share price on the same day. In each case, the best that one can do is reject with some given level of confidence the null hypothesis that what has actually occurred is the opposite of what needs to be shown. In the plaintiff's case the null hypothesis is that the corrective disclosure had no negative effect on price. In the defendant's case, the null hypothesis is that it did. These are perfectly symmetrical inquiries. At the heart of each inquiry is the question of how to deal with the possibility that, because of the price effect of other news, the null hypothesis is correct despite an observed price change suggesting the contrary.[9]

As Professor Fox goes on to observe, under this approach, defendants would not be able to meet the rebuttal standard except in very weak cases that are likely to either be washed out early or never filed. *See id.* Yet his alternative approach—requiring the defendant to persuade the court that the plaintiff will not be able to meet its statistical burden concerning price effect when called upon to demonstrate loss causation at the time of summary judgment or trial—effectively moves the loss causation inquiry on the merits to an earlier point in the litigation, before most discovery has occurred.[10] Although it too would cull out cases that made it past motions to dismiss despite a slim chance of success, it flies in the face of *Halliburton I*, in which the Court ruled that the plaintiff was *not* required to establish loss causation at the class certification stage of litigation. 563 U.S. at 812.

---

[9] Fox*, supra* note 5, at 455.

[10] *See* Fox, *supra* note 5.

The former, symmetrical approach—requiring the defendant to use the same 95% or 90% standard to reject the null hypothesis—is more consistent with the presumption/rebuttal structure of *Basic* and *Halliburton II*, despite the challenges it poses for defendants at the class certification stage. The Court in *Halliburton II* made clear that it did not wish to "radically alter the required showing for the reliance element of the Rule 10b-5 cause of action." 134 S. Ct. at 2414. Imposing the same 95% or 90% standard to judge the sufficiency of evidence for rebuttal reflects the pragmatic approach taken in *Basic* and *Halliburton II*. It is also consistent with both the investor-focused objective of securities law enforcement and the legislative decision to leave undisturbed the reliance element erected in those cases.[11]

---

[11] Any use of event studies also requires the court to consider limitations that follow from their use in securities litigation. These include: *first,* using a so-called "two tail" versus a "one tail" test for measuring unusual excess returns (which could introduce a bias against finding an event effect), Alon Brav *&* J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 WASH. U. L. REV. 583, 614 (2015); *second,* analyzing each event date in isolation which, if related, could increase the likelihood of significance), *see Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 279 (N.D. Tex. 2015) ("*Halliburton Remand*") (measuring the absence of price impact at the time of the correction and putting the burden on defendant to prove the lack of price impact); *see also* Jill E. Fisch, Jonah B. Gelbach, & Jonathan Klick, *After Halliburton: Event Studies and Their Role in Federal Securities Fraud Litigation*, Univ. of Pa. Law Sch., Inst. for Law & Econ. Research Paper No. 16-16 (Aug. 1, 2016), *available at* SSRN: http://ssrn.com/abstract=2817090 (discussing the Halliburton event studies in light of the possible limits discussed in this footnote and suggesting that three of the six would show statistical significance); or *third,* assuming that excess returns follow a normal distribution, which may not be the

## B. An Absence of Price Impact Does Not Necessarily Indicate the Absence of Fraud

Apart from the specific application of event study methodology, lower courts must address complex issues regarding the relationship between defendants' alleged misleading statements and price impact. Much of the uncertainty that has arisen from *Halliburton II's* decision can be traced to the imprecise use of the term "price impact" over the life of the *Basic* presumption. That term received a passing mention in *Basic* (suggesting possible rebuttal if market makers were privy to the truth so "market price would not have been affected by" misrepresentations), 485 U.S. at 248, and a one-line definition in dicta in *Halliburton I* ("'[p]rice impact' simply refers to the effect of a misrepresentation on a stock price"), 563 U.S. at 2179, 2187, before gaining center stage in *Halliburton II* (characterizing price impact as *Basic's* fundamental premise), 134 S. Ct. at 2416.

### 1. Price Change and Price Distortion Do Not Go Hand-in-Hand

To begin with, price impact can too easily become a search for price change at one particular point of time—for example, the time of an alleged fraudulent statement. Yet the fundamental market changes to which *Basic* was responding

---

case, Jonah B. Gelbach, Eric Helland & Jonathan Klick, *Valid Inference in Single Firm, Single Event Studies*, 15 AM. L. & ECON. REV. 495, 534-538 (2013); *see also* Jill E. Fisch, *The Future of Price Distortion in Federal Securities Fraud Litigation*, 10 DUKE J. CONST. L. 87, 89 (2015) (discussing ways in which release of fraudulent information may not have any immediate impact on price).

had transformed the Rule 10b-5 cause of action into one focused on price distortion *on the market*.[12]  Price distortion can occur even when there is no immediate price change.

To determine whether fraud occurred, therefore, focusing on the absence of price impact at a particular time can be misleading.  For example, there may be no price change at the time of the alleged misleading statement—the usual context for price maintenance or confirmatory statements—but still sufficient price distortion visible at the time of corrective statements for the case to proceed.[13]  At the class certification stage, such factors make it difficult for courts to sort out the nature of alleged absence of price change as fraudulent or not.

### 2.  Defendant Must Tease Out Other Reasons for a Price Change When Rebutting the Presumption

Moreover, as a practical matter, price impact seldom occurs in isolation from the other elements required to show fraud as well as other possible causes of price change.  The Court in *Basic* provided examples of other possible reasons for a price change, in which corrective statements entered the market and dissipated the

---

[12] Donald C. Langevoort, *Basic at Twenty: Rethinking Fraud on the Market*, 2009 WIS. L. REV. 151, 181-84 (2009).  *See also* Jill E. Fisch, *The Trouble with Basic: Price Distortion After Halliburton*, 90 WASH. U. L. REV. 895, 923-24 (2013).

[13] Hillary A. Sale & Robert B. Thompson, *Market Intermediation, Publicness, and Securities Class Actions*, 93 WASH. U. L. REV. 487, 548-49 (2015) (discussing the facts of *Basic, Halliburton* and the other recent Supreme Court cases that illustrate price maintenance and lower court recognition of price maintenance).

effects of the misstatement or plaintiffs' selling for unrelated reasons.  *See* 485

U.S. at 285.  The Court in *Halliburton II* offered another hypothetical:

> Suppose a defendant at the certification stage submits an event
> study looking at the impact on the price of its stock from six
> discrete events. . .  Suppose one of the six events is the specific
> misrepresentation asserted by the plaintiffs. . .  Now suppose the
> district court determines that, despite the defendant's study, the
> plaintiff has carried its burden to prove market efficiency, but that
> the evidence shows no price impact with respect to the specific
> misrepresentation challenged in the suit.

134 S. Ct. at 2415.  This hypothetical does not specify whether the event study is

analyzing an alleged misrepresentation at the time of the misstatement or a

corrective disclosure, whether the alleged fraud involved an affirmative

misstatement or an omission, whether there was multiple information disclosed on

a particular event day, or whether the statistical or evidentiary standard was met in

presenting the evidence.

Thus, cases seldom arrive in a cut and dried fashion and courts have to deal

with fact situations more complex than those the Supreme Court discussed.  Often,

there will be multiple pieces of information that can impact price, some of which

would be considered fraud and some not.  There can be bundled disclosures where

corrective statements about the fraud are temporally linked to positive information

that would offset the effect of the misrepresentation itself.  There also may be

intervening events that are not fraudulent.  Where there are multiple possible

information events that could contribute to price impact (or lack thereof), the

rebuttal standard necessarily requires defendants to carry the burden of separating the causes. The Court's language in *Halliburton II* focused on the effect of the misrepresentation as opposed to the other possible reasons for a price impact. 134 S. Ct. at 2414, 2416-17. If the evidence does not sufficiently foreclose the possible effect of the individual misrepresentation, however, the presumption is not rebutted.[14]

Requiring the defendant to bear this burden follows from the *Halliburton II* Court's rejection of the argument that a plaintiff should be required to prove price impact to invoke the presumption. 134 S. Ct. at 2414. It also follows from the Court's prior holdings in Amgen and in *Halliburton I* that neither materiality nor loss causation are prerequisites to class certification. 133 S. Ct. 1184; 563 U.S. 804. In the time since *Basic*, and as the focus of Rule 10b-5 litigation has shifted toward price distortion, the elements of materiality, reliance and loss causation are sometimes difficult to distinguish.[15] Little would remain of *Amgen* and *Halliburton I*—two cases decided by an unaltered Court just one and three years before *Halliburton II*, respectively—if the rebuttal opportunity did not also require such a level of proof.

---

[14] *See Halliburton Remand* in which the court on remand from the Supreme Court's decision went through six alleged misrepresentations one by one, certifying the class as to one and finding defendants had rebutted the presumption as to alleged misrepresentations in the others.

[15] *See* Fox, *supra* note 5 (discussing transaction causation and materiality).

This Court has already made clear that once the presumption of reliance is triggered, the "burden shifts to the defense to show the allegedly false or misleading statements did *not* measurably impact the market price of the security." *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 486 n.9 (2d Cir. 2008), *abrogated by Amgen*, 133 S. Ct. 1184 (2013).[16]  Anticipating *Halliburton II*, this Court also rejected the argument that the plaintiffs bear the burden of showing an impact on price.  *Id.* at 483.  By the same token, the Court in this case should require defendants to show on rebuttal that the misleading statement did not measurably impact the market price of the security.  Otherwise, the *Basic* presumption of reliance should hold firm at the class certification stage.

---

[16] The Supreme Court's decision in *Amgen* abrogated *Salomon* as to its holding that the plaintiff must show materiality at the class certification as part of satisfying the conditions for the presumption of reliance.  *Amgen* was thus the middle play of a confusing Supreme Court move: (1) *Halliburton I* held plaintiffs must prove "certain things" to invoke the presumption, listing all the conditions from *Basic's* footnote 27 except materiality;  (2) *Amgen* then affirmed a Ninth Circuit opinion that cited this omission in holding that materiality was not required at class certification; in the Supreme Court's words, materiality was an essential predicate of fraud upon the market but not required for class certification; (3) *Halliburton II*'s list of the *Basic* conditions for the presumption included materiality, adding that the standard is directed at price impact.  Although the Court rejected defendants argument that plaintiff must prove price impact to gain the presumption, it held that defendants are entitled to rebut the presumption by showing lack of price impact.  The Second Circuit's praise in *Salomon* of the district court's efforts to reconcile the conflicting messages from the Circuit on class certification standards at the time of that case bears repeating in the context of lower courts in addressing the conflicting messages from the Supreme Court on materiality, price impact, reliance and loss causation.  *See* 544 F.3d at 484.  Regardless, the Circuit's holding on defendants' burden at the rebuttal stage remains appropriate post-*Halliburton II*.

## IV.    CONCLUSION

The *Basic* presumption, reaffirmed by the Supreme Court in *Halliburton II*, plays an important role in providing plaintiffs with the ability to bring valid securities claims that could only be brought through class actions.  Plaintiffs only get the benefit of the presumption if they satisfy a multi-factor test applied by numerous lower federal courts.  Once they have demonstrated entitlement to the presumption, the burden shifts, as it should as a matter of sound policy and common sense, to permit defendants to prove by a preponderance of the evidence that there is no connection between an alleged misstatement or omission and stock price.  The showing must be sufficient to "sever" the connection between fraud and reliance.  The burden is consistent with the policy underlying the adoption of the presumption and rebuttal, the subsequent Congressional changes strengthening the elements required for plaintiff to succeed in a Rule 10b-5 case without touching the structure that existed for reliance, and other recent Supreme Court cases on class certification in the securities context.  When event studies are used in the rebuttal context to show an absence of price impact, requiring defendant to meet the same statistical standard as applied to plaintiff if they use event studies serves these same policies.  Most price impact questions will arise in contexts where there are multiple possible reasons for the price change.  In a rebuttal context, therefore, the

burden for separating the reasons using the same standards remains with the

defendant, who must sever the connection.


DATED:  September 6, 2016                    Respectfully submitted,

                                             /s/ Robert V. Prongay
                                             ROBERT V. PRONGAY
Robert B. Thompson                           Glancy Prongay & Murray LLP
600 New Jersey Avenue N.W.                    1925 Century Park East, Suite 2100
Washington, D.C. 20001                        Los Angeles, California 90067
Telephone: (202) 661-6591                     (310) 201-9150

                                             Counsel for *Amici Curiae* Securities
                                             Law Professors

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because the brief contains 6,929 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

DATED:  September 6, 2016             /s/ Robert V. Prongay
                                                      ROBERT V. PRONGAY